UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| JACKIE M. HOUGHTON<br>(Social Security No. XXX-XX-8418),<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security Administration,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 3:10-cv-70-WGH-RLY |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 6, 12) and an Order of Reference entered by Chief Judge Richard L. Young on August 27, 2010 (Docket No. 13).

### I. Statement of the Case

Plaintiff, Jackie M. Houghton, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f). The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB[1] on October 5, 2006, alleging disability since June 30, 1999. (R. 119-21). The agency denied Plaintiff's application both initially and on reconsideration. (R. 49-52, 59-65). Plaintiff appeared and testified at a hearing before Administrative Law Judge Augustus Martin ("ALJ") on July 1, 2009. (R. 23-46). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 23). On July 13, 2009, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy. (R. 14-22). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on May 7, 2010, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

**A. Vocational Profile**

Born on July 6, 1970, Plaintiff was 39 years old at the time of the ALJ's decision, with a high school education. (R. 21-22). Her past relevant work

---

[1]As an initial matter, the court notes that Plaintiff also applied for Supplemental Security Income ("SSI") benefits on September 30, 2006. (Defendant's Memorandum in Support of the Commissioner's Decision at Ex. 1). The application was denied on October 18, 2006, because Plaintiff's spouse's income disqualified her from entitlement to SSI benefits. (*Id.*). On January 10, 2007, Plaintiff, with the assistance of her counsel, Eric Yocum, clearly indicated in her request for review that she did not intend to request a review of the SSI decision. (R. 58). Furthermore, the hearing transcript clearly indicates that it is a hearing for DIB benefits, not SSI benefits. (R. 23). Therefore, Plaintiff must demonstrate disability prior to December 31, 2004, when her insured status for DIB expired.

experience included jobs as a housekeeper (light, unskilled) and nail technician (sedentary, semi-skilled). (R. 20).

**B. Medical Evidence**

    **1. Plaintiff's Impairments**

**Plaintiff's Back:**

Plaintiff experienced a sudden onset of low back pain that radiated into her legs in December 1998; Plaintiff also suffered from paresthesias and eventually underwent injections. (R. 211-14). Her pain, however, allegedly worsened. (R. 211). Plaintiff was diagnosed with S1 radiculopathy that was resistant to other forms of therapy. (R. 212). She subsequently underwent an L5-S1 discectomy performed by Mark Cobb, M.D., on January 26, 1999. (R. 213).

Plaintiff reported "excellent relief" of her symptoms at a February 8, 1999, follow-up appointment. (R. 216). On March 2, 1999, Dr. Cobb indicated that Plaintiff had done "quite well" since her surgery, and Plaintiff reported "excellent resolution" of her back and leg pain. (R. 215). Plaintiff had already returned to part-time work, and Dr. Cobb cleared her for a complete return to work without limitation. (R. 215).

The record indicates that Plaintiff sought treatment for various other ailments from 2000-2002 for unrelated complaints such as sinus pressure, coughing, vomiting, and chills. (R. 242-65). On October 3, 2001, Plaintiff visited the hospital after falling down several stairs onto her buttocks, but there was no indication that she injured her back. (R. 255-56).

-3-

Plaintiff complained on February 26, 2003, that she had pulled a muscle in her left shoulder while cleaning. (R. 238-40).

Plaintiff did not again seek treatment for any spine-related complaints until March 26, 2003, when she reported neck, shoulder, and arm pain that had begun on February 1. (R. 269-71). She indicated that she had been to physical therapy for the pain, but had not undergone any chiropractic treatment or injections. (R. 269). The record indicated that a March 13 MRI revealed a large left paracentral herniated disc at C6-7 and diffuse disc bulge at C5-6; Plaintiff was diagnosed with C-7 radiculopathy, depression, and chronic smoking. (R. 270). Plaintiff elected to proceed with surgery rather than conservative treatment. Plaintiff underwent a discectomy on her cervical spine on March 28. (R. 270).

Plaintiff reported some neck pain and difficulty sleeping during a follow-up appointment on May 21, 2003, but an exam was completely normal. (R. 277).

On September 12, 2003, Plaintiff reported to John Grimm, M.D., that her neck was doing well; she had occasional pain, but nothing severe. (R. 284-85). It was noted that Plaintiff was busy at home and did not work outside of the home. (R. 284). Plaintiff exhibited a normal non-antalgic gait and a physical examination was negative other than minimally reduced range of motion in her low back. (R. 284). Plaintiff did report low back pain, and X-rays revealed degenerative disc disease at L5-S1. (R. 284).

A physical examination was unchanged on October 13, 2003, and revealed a normal gait and no motor or sensory deficits. (R. 287). An October 16, 2003,

MRI showed post-operative changes and some degenerative disc disease in Plaintiff's lumbar spine, but was "otherwise negative." (R. 315). A November 2003 discogram showed a "near normal picture" with a mild dull ache at L4-5. (R. 307). On November 7, 2003, and December 8, 2003, examinations were unchanged, although Plaintiff continued to report significant pain. Dr. Grimm implored Plaintiff to stop smoking, but Plaintiff indicated she was having difficulty quitting. (R. 288-89).

Plaintiff returned to Dr. Grimm on February 13, 2004, with complaints of increasing lower back pain that radiated into her lower extremities. (R. 290). Plaintiff displayed a normal gait and normal motor and sensory testing in her lower extremities. Plaintiff indicated that she wanted to proceed with another surgery. (R. 290). Plaintiff elected to undergo an L5-S1 fusion surgery on March 4, 2004, with Dr. Grimm. (R. 290-92).

At a six-week follow-up examination on April 19, 2004, Plaintiff was doing well and denied significant leg complaints; a physical examination was normal, and X-rays revealed excellent alignment. (R. 293). A physical examination remained unremarkable on May 14, 2004, but Plaintiff reported pain radiating into both legs. (R. 294).

On August 2, 2004, Plaintiff returned to Dr. Grimm. (R. 295). She reported back pain that radiated into her lower extremities. Plaintiff indicated that sitting was well tolerated as desired, but she could only walk for two blocks and stand for two minutes. An exam was essentially normal. (R. 295).

On August 24, 2004, Plaintiff visited the St. Mary's emergency room with complaints of low back pain for three days. (R. 230-33). It was noted that she was scheduled for an injection the following Monday. (R. 231). Plaintiff underwent a steroid injection on August 30. (R. 300-01).

On September 1, 2004, Steve Barnett, M.D., Plaintiff's family physician, referred Plaintiff to Dr. "Waling or Rupert." (R. 514).

On September 16, 2004, during a consultative examination with Steven Rupert, D.O., Plaintiff reported a five-month history of intermittent aching back pain exacerbated by activity and ranging from a level four out of ten to a level ten out of ten in severity. (R. 335-39). Plaintiff reported sleeping eight hours a night but waking four times a night. (R. 335). Plaintiff also suffered from depression and alcohol abuse. (R. 336). Plaintiff reported that she was a 15-year smoker who still smoked a quarter pack of cigarettes a day. (R. 336). It was noted that Plaintiff performed all activities of daily living but had difficulty with lifting, driving, and housework. (R. 337). A physical examination was essentially unremarkable and revealed no sensory deficits, excellent strength in Plaintiff's arms and legs, painless range of motion in her spine, and negative straight leg raising. (R. 337-38). Dr. Rupert recommended a course of physical therapy and a series of steroid injections; he performed the first injection on the day of the examination. (R. 338-39).

Plaintiff again saw Dr. Rupert on October 1, 2004. (R. 332-34). She complained of cervical pain and worsening headaches. (R. 332). Examination was again essentially normal. (R. 333-34).

Plaintiff underwent additional injections on October 13 and 20, 2004. (R. 325-29). Dr. Rupert noted that Plaintiff's lower back pain and lower extremity pain completely resolved from the October 13 injection. (R. 329). Plaintiff's insured status expired on December 31, 2004.

**Plaintiff's Mental Health:**

On May 1, 2003, Plaintiff told a nurse in Dr. Barnett's office that she cries a lot and doesn't know why, that she feels like she has solved all of her problems and that things are better, that her neck is doing better, that she had no suicidal ideations, and that she was not sleeping well. A diagnosis of Depression, major recurrent, was circled. (R. 520). On July 2, 2003, Plaintiff reported to Dr. Barnett that she was angry and anxious all of the time, that she felt like she was going to snap, and that she was currently living with two mentally disabled sisters. (R. 518). On September 1, 2004, Dr. Barnett indicated that Plaintiff stayed nervous all of the time. (R. 514). On September 11, 2003, Plaintiff reported to a nurse at Dr. Barnett's office that she did not feel like doing anything and had anxiety attacks a few times per week; a diagnosis of Depression, major recurrent, was circled. (R. 517).

 **2. State Agency Review**

On November 15, 2006, A. Dobson, M.D., a state agency physician, reviewed the medical evidence of record and found that, as of December 31, 2004, Plaintiff retained the residual functional capacity to perform light exertion work activity with no postural limitations. (R. 384-92). Dr. Dobson indicated that he based his opinion on the fact that April and August 2004 exams of

Plaintiff revealed essentially normal results. (R. 385). A second state agency physician, R. Fife, M.D., reviewed all the evidence and affirmed this assessment on January 24, 2007. (R. 393).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

### V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through December 31, 2004; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 16). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had one impairment that is classified as severe: back impairments. (R. 16). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible. (R. 19-20). Consequently, the ALJ concluded that Plaintiff retained the RFC for sedentary

work with no overhead lifting, occasional postural movements, and only simple repetitive tasks. (R. 18). The ALJ opined that Plaintiff was unable to perform her past work. (R. 20). However, Plaintiff retained the RFC to perform a significant number of jobs in the regional economy, including: hand packer (2,000 jobs) and production worker/assembler (2,500 jobs). (R. 20). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 21).

### VI. Issues

Plaintiff has essentially raised three issues. The issues are as follows:

1. Whether Plaintiff's depression was a severe impairment.

2. Whether Plaintiff's impairments met a listing.

3. Whether the ALJ's credibility determination is patently wrong.

**Issue 1: Whether Plaintiff's depression was a severe impairment.**

Plaintiff first argues that the ALJ erred by failing to find that her depression was a severe impairment at step two of the five-step evaluation process. As discussed above, 20 C.F.R. § 404.1520 provides a five-step evaluation process. Step two of that process involves determining if an individual has a severe impairment. Step two is simply an initial screening device to eliminate consideration of individuals who have only slight impairments. *Taylor v. Schweiker,* 739 F.2d 1240, 1243 n.2 (7th Cir. 1984). As then District Judge David Hamilton indicated, "[a]s long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.' The ALJ's classification of an

impairment as 'severe' or 'not severe' is largely irrelevant past step two. What matters is that the ALJ considers the impact of all of the claimant's impairments – 'severe' and 'not severe' – on her ability to work." *Gordon v. Astrue,* 2007 WL 4150328 at *7 (S.D. Ind. 2007).

In this case, while the ALJ failed to conclude that Plaintiff's depression was severe, he did find one other severe impairment and clearly proceeded to the other steps of the five-step evaluation process. The ALJ extensively discussed Plaintiff's depression, devoting an entire page of findings to that discussion. (R. 17). The ALJ expressly states that the effects of Plaintiff's mental impairments where reflected in Plaintiff's RFC. (R. 17). Hence, there was no reversible error at step two.

Additionally, Plaintiff has failed to provide any objective medical evidence to support more restrictive mental limitations. Plaintiff appears to have primarily been treated during the relevant time period for her anxiety and depression by nurses at her primary physician's office. She has not sought counseling or other mental health treatment according to the record. Finally, the ALJ did limit Plaintiff to simple repetitive tasks, and no doctors have opined that Plaintiff has additional mental limitations beyond the RFC given by the ALJ.

**Issue 2: Whether Plaintiff's impairment met a listing.**

Plaintiff also claims that the ALJ erred by failing to conclude that her back impairments met Listing 1.04 in 20 C.F.R Part 404, Subpart P, Appendix 1. Listing 1.04 provides as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
>
> With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04. In order for an individual to be disabled under a particular listing, his impairment must meet each distinct element within the listing. *Rice v. Barnhart,* 384 F.3d 363, 369 (7th Cir. 2004). And, it is important to remember that at step three, the burden rests on Plaintiff to demonstrate that she meets the listing.

In this case, a review of all of the objective medical evidence from Plaintiff's alleged onset date to her date last insured reveals that Plaintiff's back

impairments did not meet or substantially equal Listing 1.04.[2] Plaintiff has not directed the court to any piece of evidence in the record that indicates that Plaintiff had the necessary medical test results to meet subpart B or C of Listing 1.04. Therefore, the court is left with only the possibility that Plaintiff met or substantially equaled subpart A. However, here, the medical records reveal that on September 16, 2004, after all of Plaintiff's surgeries had been performed, Dr. Rupert completed an unremarkable exam that revealed no sensory deficits, excellent strength in Plaintiff's arms and legs, painless range of motion in her spine, and negative straight leg raising. (R. 337-38). There are other instances of normal strength and reflexes in the record, including May and September 2003 exams, that were essentially normal (R. 277, 284-85), an October 2003 exam that revealed no motor or sensory deficits (R. 287), and normal motor and sensory testing in February 2004 (R. 290). Because the court has been unable to find any records that reveal the requisite motor loss, sensory/reflex loss, or positive straight leg testing to meet or substantially equal subpart A of Listing 1.04, the court concludes that the ALJ's decision at step three of the five-step sequential evaluation process is supported by substantial evidence.

---

[2]The court can trace the path of the ALJ's reasoning because the court has been unable to locate any evidence in the record that demonstrated that all of the requirements to Listing 1.04 are met. However, the court does not believe the ALJ's opinion meets the articulation standards required by the Seventh Circuit. In discussing the step three listing issue, the ALJ simply quotes the listing and refers only to "Ex. 2F." (R. 18). That exhibit consists of 48 pages of medical records. Such a reference to a bulk exhibit, rather than to individual medical opinions, is not the appropriate method in which an ALJ should indicate that he has properly reviewed the record. In the future, the court will require the Commissioner to specifically reference medical findings that support the decision at step three.

**Issue 3:     Whether the ALJ's credibility determination is patently wrong.**

Plaintiff also finds fault in the ALJ's assessment of her credibility. An ALJ's credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, the ALJ's "credibility" decision in this case is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain. Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's*

*statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*.

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other

symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ, in this case, conducted a very thorough credibility determination that examined all of the seven factors listed in § 404.1529. (R. 19-20). Plaintiff found fault in this credibility determination, in part because the ALJ failed to address medical evidence after Plaintiff's insured status expired. As was discussed above, Plaintiff only appealed her DIB decision, and, therefore, she must demonstrate that she became disabled on or before December 31, 2004, when her insured status expired. Consequently none of the evidence Plaintiff has pointed to in her brief, including some evidence from nearly five years after her insured status expired, is relevant to her condition prior to December 31, 2004, and cannot be considered by the court.

As for the evidence of record that *did* have a bearing on the relevant time period, the court notes that the ALJ's credibility determination was clearly not "patently wrong."[3] Plaintiff, for example, claimed extremely limited activities of daily living during her hearing. Yet, the record indicates that in March 1999, Dr.

---

[3]It is important to note that Plaintiff alleges disability beginning on June 30, 1999. Plaintiff regularly throughout her brief argues that the ALJ's decision was flawed because he referenced either statements made by Plaintiff or medical records that were rendered prior to her back surgery in March 2004. However, Plaintiff alleges that she is entitled to payment of disability benefits for nearly five years prior to the March 2004 surgery. And, because there is substantial medical evidence in the record (including exams in April, May, September, and October 2004) that revealed that Plaintiff displayed essentially normal exam results after her March 2004 surgery, it was entirely appropriate for the ALJ to reference all of the medical evidence and statements from Plaintiff, including those prior to her March 2004 surgery.

Cobb cleared her for a complete return to work without limitation (R. 215), and Plaintiff did not complain of any more back related problems for four years, until March 2003. Additionally, Plaintiff reported pulling a muscle while cleaning in February 2003. (R. 238-40). And, in September 2003, Dr. Grimm noted that Plaintiff was busy at home. (R. 284). This was a proper use of these records by the ALJ to conclude that Plaintiff's reports of her activities of daily living during the relevant time period were not fully credible.

As for the aggravating factors, side effects of medications, and other methods of treatment, the ALJ rightly noted that Plaintiff alleged disability beginning in June 1999. Yet the record reveals practically no treatment for Plaintiff's allegedly disabling back condition from her alleged onset date to March of 2003. This lack of objective medical evidence to support her complaints of disabling pain certainly undercuts her allegations. As for the time frame from March 2003 until her insured status expired in December 2004, the court notes that Plaintiff routinely displayed essentially normal exam results. Plaintiff also reported no side effects of medication that could worsen her condition. As for other methods of treatment, there is *some* evidence in the record that her March 2004 surgery, as well as subsequent steroid injections, improved her pain. Although there is other evidence in the record that indicates that Plaintiff's pain returned, the court is not permitted to re-weigh the evidence, and the ALJ's credibility decision, as a whole, is supported by substantial evidence and must be affirmed.

## VII. Conclusion

The ALJ's decision that Plaintiff's depression was not a severe impairment is not reversible error. The ALJ also reasonably concluded that Plaintiff's impairments did not meet a listing. Finally, the ALJ conducted a thorough credibility determination. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 18th day of February, 2011.

_William G. Hussmann, Jr._
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Eric Joseph Yocum
eric_yocum@msn.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov